**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

KEVIN LEON DUCHESNE,

     Plaintiff

        v.

BANCO POPULAR DE PUERTO RICO, INC., ET AL.

     Defendants

CIVIL NO. 04-2161 (PG)

**OPINION AND ORDER**

Plaintiff Kevin Leon Duchesne (hereinafter "Plaintiff" or "Leon"), invoking the Court's federal question jurisdiction under 28 U.S.C. § 1331, brings claims against defendant Banco Popular de Puerto Rico, Inc. (hereinafter "Defendant" or "BPPR") under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, for gender discrimination and retaliation.  Additionally, Plaintiff brings a claim under the Comprehensive Budget Reconciliation Act ("COBRA") amendments to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1161 *et seq.*, for the alleged failure to notify him of his right to continued insurance coverage. Plaintiff further invokes the Court's supplemental jurisdiction under 28 U.S.C. § 1367 for claims arising under Puerto Rico law.[1]  Plaintiff seeks compensatory damages, injunctive relief, costs and attorneys' fees.  Pending

---

[1] Plaintiff's supplemental claims are brought under Puerto Rico Law 115, P.R. Laws Ann. tit. 29, §§ 194a *et seq.*; Puerto Rico Law 100, P.R. Laws Ann. tit. 29, §§ 146 *et seq.*; Puerto Rico Law 80, P.R. Laws Ann. tit. 29, §§ 185a *et seq.*; Puerto Rico Law 69, P.R. Laws Ann. tit. 29, § 1321 *et seq.*; and the Puerto Rico Constitution.

before the Court are Defendant's motion for summary judgment (Docket No. 13), which Plaintiff opposes (Docket No. 35), as well as Defendant's reply (Docket No. 49).

  For the reasons that follow, the Court **GRANTS** Defendant's motion for summary judgment.

## I. Summary Judgment Standard

     Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. FED. R. CIV. P. 56 (c); Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008). A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. Prescott, 538 F.3d at 40 (citations omitted). "'A fact is material if it has the potential of determining the outcome of the litigation.'" Id. (quoting Maymi v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008)).

     To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record through definite and competent evidence. See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997); Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (internal citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo

Int'l, 229 F.3d 49, 53 (1st Cir. 2000).  While the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment," the Court may grant the motion if the non-moving party rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." Forestier Fradera v. Municipality of Mayaguez, 440 F.3d 17, 21 (1st Cir. 2006) (quoting Benoit v. Technical Mgf. Corp, 331 F.3d 166, 173 (1st Cir. 2003)).  It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

## II. Factual Background

The following relevant facts are deemed uncontested by the Court because they were included in the parties' motions and were agreed upon, or were properly supported by the evidence and not genuinely opposed.  The facts are viewed in the light most favorable to Plaintiff.

### A. Plaintiff's Title VII Claim

     On September 17, 2001, Plaintiff began working as a Credit Card
Customer Service Representative in BPPR's Fraud Department.  Aida Ferrer
("Ferrer"), Plaintiff's eventual supervisor, was one of two female
representatives of BPPR who interviewed Plaintiff, a male, and two other
female applicants.  Ferrer recommended hiring Plaintiff because she
understood that he had relevant training and experience from prior employment
as a credit card customer service representative.  Plaintiff concedes that
Ferrer did not take issue with his gender during the hiring process.

     On October 1, 2001 and again, on February 4, 2002, Plaintiff received
copies of BPPR's Employee Manual, which included a copy of the bank's *Equal
Employment Opportunity Policy* and *Attendance Policy.*

     During the relevant time period, the Fraud Department (hereinafter "the
Department") oversaw and investigated allegations of fraudulent credit card
use.  Due to the nature of the Department's work, employees' work delays
could cost the bank significant sums of money and negatively affect client
relations.  BPPR, therefore, required employees working in the Department to
maintain a work productivity of 100%.

     As a Customer Service Representative in the Department, Plaintiff
completed two tasks during different periods of his employment: "case
monitoring" and "case opening."  When Plaintiff began work in the Department,
he worked in "case monitoring," which entailed monitoring suspicious credit
card transactions.  On or about April 2002, Plaintiff began opening cases on
alleged fraudulent activity.  Opening cases required greater organizational
skills and a working knowledge of governing regulations.

     Other employees who worked in the Department during the period of
Plaintiff's employment include:  Nilsa Arroyo ("Arroyo"), Margarita Cuevas
("Cuevas"), Lilliam Cruz ("Cruz"), Zoraida Pol ("Pol"), Migdalia Aviles
("Aviles"), Sergio Caraballo ("Caraballo"), his supervisor, Ferrer, and the

Department Director, Daysi Ortiz ("Ortiz").  All of the above-listed
employees are female and all had more seniority than Plaintiff during his
employment, with the exception of Caraballo.  Ferrer hired Caraballo, a male
employee, from another department of BPPR in September or October 2002.

     When Plaintiff began work in the Fraud Department, he received training
in Department operations.  In addition, Plaintiff received training from more
experienced employees.  Pol trained Plaintiff in "case monitoring" and Cuevas
trained him in "case opening".  Prior to Plaintiff's employment, at least two
employees, Cuevas and Cruz, received training in credit card regulation
directly from credit card companies.  Plaintiff did not receive this
training.  It is unknown whether credit card companies were offering such
training during the period of Plaintiff's employment or whether the training
would have been made available upon request.

     As the Department supervisor, Ferrer personally oversaw and evaluated
employees' compliance with the 100% productivity requirement, among others.
She accomplished this, in part, through performance evaluations and written
memoranda.  When evaluating an employee, Ferrer assigned a number value to
reflect: (1) how well the employee performed the objectives and
responsibilities of his or her position; (2) to what degree the employee
possessed a specific knowledge or skill; and (3) whether the employee
demonstrated specific behaviors.  Plaintiff received three (3) such
performance evaluations from Ferrer during his employment, in addition to
four (4) written memoranda.  Ferrer would periodically meet with the poor
performers to discuss how they were doing, see if they were improving, and
provide a monitoring plan.

     Plaintiff's first evaluation covers his probationary employment period,
ending December 16, 2001.  The evaluation indicates that Plaintiff "partially
completed" the attendance and punctuality requirement as well as the required

skill of using ones "own criteria to analyze and solve problems, channel what it cannot resolve and present alternatives." (See Docket No. 13-2 at 6.) The evaluation further indicates that Plaintiff was compliant with all other requirements.  Ferrer recommended that Plaintiff should begin "delegating issues that could not be resolved and present alternatives." (Id.) Plaintiff avers that the evaluation was "not far from reality" and was otherwise "acceptable" with one exception.  (Docket No. 17-2 at 40-41.) Plaintiff disagrees with Ferrer's evaluation of his compliance with attendance and punctuality requirements because he believes that his absences were justified.  Notwithstanding, Plaintiff recognizes that his evaluation, pertaining to absences and punctuality, is "not far from what was required from other employees." (Id. at 42.)  On December 19, 2001, Plaintiff signed his first evaluation, acknowledging that he had discussed it with Ferrer, and declined to comment on its contents.  Ferrer approved Plaintiff's probationary period.

     Between the issuance of Plaintiff's first and second evaluations, Ferrer issued a memorandum to Plaintiff, dated March 13, 2002.  The memorandum addressed his absenteeism.  At the time, Plaintiff had accrued 9.12 sick days and 1.56 personal days since his start date on September 17, 2001.  Plaintiff signed the memorandum, acknowledging its receipt, but believes that it was not justified because his absenteeism did not constitute a pattern of absences, which is prohibited by the Employee Manual.  Plaintiff also believes that the March 13, 2002 memorandum is discriminatory because he alleges that BPPR never admonished Ferrer for her own absences in May 2002. It is unknown whether Ferrer actually accrued absences in May 2002, and if so, whether BPPR reprimanded her for those absences.

     Plaintiff's second evaluation, completed by Ferrer, covers his employment period beginning May 1, 2002 and ending April 30, 2002.  The

evaluation indicates that Plaintiff "did not comply" with the productivity requirement, having achieved only 50% productivity over a three-month period. Plaintiff agrees that his productivity was not 50%, but alleges that it only appeared as such because BPPR did not instruct him on how to correctly record performance statistics for his task.  It is unknown whether Ferrer knew that Plaintiff might have incorrectly tracked his performance at the time she conducted his second evaluation.  Plaintiff first realized that he had incorrectly tracked his performance when he discussed his second evaluation with Ferrer.  At no point did Plaintiff request an opportunity to revise his statistics.  Plaintiff believes that his second evaluation was discriminatory, in part, because his productivity should have been evaluated in a different manner to account for tracking errors.

Plaintiff's second evaluation indicates that he did not comply with attendance requirements.  During the evaluation period, Plaintiff was absent eight (8) days and was late to work twice.  Plaintiff does not believe that these absences constitute a "pattern of absences," which is prohibited under BPPR's attendance policy.  Again, Plaintiff believes his second evaluation was unjust and discriminatory because Ferrer was allegedly also not reprimanded for absences that she accrued in May 2002.  Again, it is unknown whether Ferrer actually accrued absences in May 2002 and if so, whether BPPR reprimanded her for those absences.

Plaintiff's second evaluation further indicates that Plaintiff only partially complied with the requirement to use his own criteria to analyze and solve problems.  Ferrer recommended that Plaintiff "continue developing his initiative to achieve his maturity as an employee" and "increase his dedication and make good use of his time so that he can improve the performance of his tasks and increase his productivity." (Docket No. 13-2 at 10.)  The evaluation further informs that Plaintiff's productivity would be

reevaluated in the future.  On June 20, 2002, Plaintiff signed his second evaluation without comment.

Between the issuance of Plaintiff's second and third evaluations, Ferrer issued a second written memorandum to Plaintiff, dated September 12, 2002.  The memorandum noted Ferrer's many discussions with Plaintiff regarding the importance of timely performance, admonished him for delays in his casework, and encouraged him to make an effort and "put to date" his job. (Id. at 17.)  Ferrer spoke with Plaintiff on at least two occasions regarding timely performance.  Plaintiff takes issue with the September 12, 2002 memorandum because BPPR did not provide him with training in credit card regulations necessary to do his job and allegedly overloaded him with casework during the absence of coworkers.  Plaintiff did not respond to the second memorandum.

Plaintiff believes that there is a discriminatory animus behind the September 13, 2002 memorandum because Arroyo, a female employee in the Department, was allegedly not admonished for her noncompliance with the 100% productivity requirement. Arroyo's evaluations for employment periods ending April 30, 2002 and April 30, 2003 indicate that Arroyo "did not comply" or only "partially complied" with the 100% work productivity requirement, achieving a work productivity of 16% and 82%, respectively. (Id. at 28.) Arroyo's evaluations also indicate that she only partially complied with the requirement to use one's "own criteria to analyze and solve problems."

Arroyo was an employee of BPPR for more than twenty (20) years.  Like Plaintiff, Arroyo held the title of "customer service representative" but her routine duties were different and simpler than Plaintiff's, describing them as those normally attributed to a clerk.  As a clerk, Arroyo produced reports, transferred balances, helped with filing and other necessary incidents of her job, but worked in "monitoring" only on an as-needed,

emergency basis. (Id. at 25.)  Plaintiff, though, avers that because Arroyo occupied his same job title as a "service representative" that she worked in the same position with the same duties. (See Docket No. 37 at 3.)  Ferrer admonished Arroyo for not being compliant with the 100% productivity requirement, both verbally and through written evaluations.  Like Plaintiff, Arroyo did not receive training in credit card regulation directly from a credit card company.

Plaintiff's third evaluation covers his employment from June 1, 2002 through October 15, 2002.  The evaluation indicates that Plaintiff did not comply with the requirements to "work fraud case files . . . in a maximum of 7 days," to "register and work cross charges related to the cases," and to "maintain a monthly productivity of 100%." (Docket No. 13-7 at 1.)  The evaluation notes a five-week delay in Plaintiff's cases, a seven-week backlog of cross-charges, and a work productivity of 86%. (Id.)  The evaluation indicates that Plaintiff partially complied with the requirement to "use own criteria to analyze and solve problems," and had opportunity for improvement with respect to "dedication and commitment" and achieving tasks in the time required.  On October 18 2002, Plaintiff signed his evaluation without comment.

Plaintiff takes the position that his work productivity suffered during the third evaluation period because:  (1) he still had not received the training in credit card regulation that he needed to improve his productivity; (2) his caseload increased during the evaluation period due to the absence of three employees; and (3) he was assigned certain "alternate tasks"[2] in addition to his routine duties.  In May 2002, prior to his third evaluation, Plaintiff asked Ortiz how his evaluation would be handled in

_____

[2] Such tasks include the collection of documents from American Express for the Claims Department during a three-week period in July 2002; the preparation of a "security report" during a two-week period, and a daily "AMMO" report during the first half hour of work each day. (See Docket No. 13-4 at 70-71.)

light of the aforementioned factors.  Ortiz provided Plaintiff with a
reference book on credit card regulation.  It is unknown whether Ortiz ever
spoke with Ferrer regarding the issues raised by Plaintiff or whether those
issues were taken into account in his third evaluation.  Plaintiff signed his
third evaluation but informed Ferrer that he did not agree with it because he
never received training in credit card regulation and, therefore, lacked the
requisite knowledge to do his job.  Plaintiff believes there was a
discriminatory animus behind his third evaluation, alleging that Cruz was
never reprimanded for a backlog of cases in her January 2003 queue.

Ferrer issued a third memorandum to Plaintiff, dated October 16, 2002.
The memorandum noted a violation in work standards related to performance
efficiency and informed Plaintiff that he was being transferred back to "case
monitoring." (Docket No. 13-7 at 6.)  The memorandum mentioned a backlog in
Plaintiff's queue of cases that had been updated by another employee.  At the
time the memorandum was issued, Plaintiff's list of cases was, again, delayed
by five (5) weeks.  The memorandum warned Plaintiff that he would be
separated from his employment if his job performance did not improve.  Upon
receipt of the memorandum, Plaintiff reiterated his concern to Ferrer that he
did not have adequate training in credit card regulations to do his job.

Ferrer issued a fourth memorandum to Plaintiff, dated November 8, 2002.
The memorandum reprimanded Plaintiff for having a case in his queue of cases
dated October 22 and reminded Plaintiff to abide by company policy governing
personal use of information systems.

Twice in October 2002 and once in January 2003, Plaintiff overheard
Ferrer make the following sexually-charged remark to Cruz, a female employee:
"cuando la cabeza de abajo se para, la de arriba no piensa," which translates
into "when the head below rises, the one above does not think," referring to
the male penis.  The first time it was uttered, Ferrer did not make the

comment in reference to Plaintiff.  Ferrer made the comment at Cruz's desk, located across the hallway, approximately five to six feet from Plaintiff's desk, while discussing a newspaper article concerning domestic violence. Plaintiff was offended for what the comment meant (that a man cannot measure consequences when sexually aroused) and by the vulgar manner in which it was expressed.  Although offended, Plaintiff did not mention the incident to other employees or report the comment to the Human Resources Department for fear of a confrontation or that they would use it against him as a reason for which he did not agree with the evaluations.

On February 7, 2003, BPPR terminated Plaintiff's employment for failure to meet productivity requirements.  Ferrer and Ortiz, together with Ms. Doris Pardo ("Pardo") from the Human Resources Department, made the decision to terminate Plaintiff.  BPPR hired a female candidate to fill Plaintiff's position.  It is unknown how many men, if any, applied for the position.

**B. Plaintiff's COBRA Claim**

In July 2002, Plaintiff moved out of his grandmother's home in Rio Piedras, Puerto Rico.  Plaintiff alleges that, prior to his termination, he notified a representative of BPPR's Human Resources Department of his address change.  On March 11, 2003, an official in the Personnel Benefits Department mailed Plaintiff a notification of his right to continued insurance coverage under COBRA ("COBRA notification") to his address of record in Rio Piedras. BPPR did not receive a communication from Plaintiff regarding his COBRA notification, either before or after its issuance, and Plaintiff made no effort to contact BPPR regarding medical plan benefits following his termination.

BPPR was first made aware that Plaintiff did not receive his COBRA notification on February 17, 2005, upon the receipt of Plaintiff's complaint. Upon investigation, BPPR discovered that the postal service returned Plaintiff's COBRA notification to BPPR's central mail center on or about June 2, 2003.  The mail center did not forward the notification to the Benefits Department for reasons that are unknown.  On March 14, 2005, Banco Popular sent Plaintiff's COBRA notification to Plaintiff at his new address in San Juan, Puerto Rico.  The letter offered Plaintiff two alternatives: receiving retroactive coverage as of March 1, 2003 or prospective coverage for eighteen (18) months.  In April 2005, the postal service returned the March 14, 2005 letter as unclaimed.  Upon receipt, a representative of the Benefits Department noted that the letter had been addressed to the wrong zipcode. Notwithstanding, the postal service attempted to deliver the letter to the correct zip code in San Juan.  On April 21, 2005, counsel for BPPR sent the March 14, 2005 correspondence to Plaintiff's counsel, who received it on April 22, 2005.

### III. Discussion

#### A. Title VII Sex Discrimination Claim

On September 16, 2005, BPPR filed the pending motion for summary judgment, arguing for the summary disposition of all of Plaintiff's claims. Defendant argues that Plaintiff cannot establish a prima facie case of sex discrimination because his employment terms, salary and benefits were not changed during his employment at the bank, and because he was terminated "only after he repeatedly failed to comply with the requirements of his position despite the numerous warnings and opportunities he was given to improve the same." (Docket No. 13-3 at 2.)  Defendant submits that Plaintiff

never complained of sex discrimination or filed an administrative charge to that effect during his employment with BPPR.  Moreover, Defendant states that it has proffered a legitimate and nondiscriminatory reason for its action that cannot be proven to be a mere pretext for discrimination on the basis of sex.  At no time, claims Defendant, did bank employees engage in discriminatory conduct against Plaintiff due to his sex.  The sole reason for his termination, adds Defendant, was his failure to comply with his job requirements, despite the numerous opportunities for improvement that he was given.

Plaintiff counters that a trial is warranted in light of direct and circumstantial evidence of sex discrimination.  Plaintiff submits that he has proffered sufficient evidence of disparate treatment to defeat summary judgment of his claims.  Specifically, Plaintiff avers that he repeatedly requested but was denied training in order to adequately perform the functions assigned to his position, and that as a consequence his productivity suffered.  He then claims that his immediate supervisor, Ferrer, engaged in a pattern of discriminatory conduct by reprimanding his productivity while counseling female co-workers with lower productivity levels on how to improve their job performance.  Plaintiff alleges that he was not afforded training or direct counseling because of his gender, which adversely affected his job performance and ultimately led to his termination.

**1. Law Governing Title VII Sex Discrimination**

A more thorough exposition of the law is made necessary by Plaintiff's arguments, which employ direct evidence to trigger a "mixed-motives" analysis, as well as circumstantial evidence under the familiar burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792, 802 (1973).  Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a)(1).[3]  Title VII also makes unlawful any practice whereby an employer discriminates against an individual in the admission to any program established to provide training, as is here alleged. See 42 U.S.C. § 2000e-2(d).  In a Title VII action, a plaintiff may establish a prima facie case of discrimination by presenting either direct or circumstantial evidence of discriminatory intent. See McDonnell Douglas Corp., 411 U.S. at 802; accord Lockridge v. University of Maine System, 597 F.3d 464, 470 (1st Cir. 2010).  The analytical approach pertinent to each showing of evidence is distinct and self-contained, and therefore, the Court generally treats them separately.

    "If an employee makes a sufficiently strong showing of discrimination using direct evidence, but the employer responds with a showing of legitimate reasons for the actions it took, then the court may view the employer as having mixed motives - some legitimate, some not." Weston-Smith v. Cooley Dickinson Hospital, Inc., 282 F.2d 60, 64 (1st Cir. 2002); see 42 U.S.C. § 2000e-2(m) (making it unlawful for employers to use sex as a motivating factor for any employment practice, even though other factors also motivated

_____
    [3] Title VII's prohibition against sex discrimination applies to men as well as women, as is the case here. See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998); accord Soto v. Runyon, 13 F. Supp. 2d 215, 220 n.4 (D.P.R. 1998). There is a split of authority among the circuits as to whether a higher prima facie burden should be required in cases of "reverse discrimination." Some circuits, for example, require such plaintiffs to establish "background circumstances" demonstrating that the employer is the type that would be inclined to discriminate against a "non-minority" plaintiff. See, e.g., Adamson v. Multi Community Diversified Services, Inc., 514 F.3d 1136 (10th Cir. 2008); Duffy v. Wholle, 123 F.3d 1026, 1036 (8th Cir. 1997). Other circuits reject this approach or have declined to decide this issue. The First Circuit and this Court fall into the latter category. Therefore, under prevailing First Circuit precedent, this Court should automatically default to the McDonnell Douglas burden-shifting scheme without imposing any additional hurdles. See, e.g., Douglas v. J.C. Penney Company, Inc., 474 F.3d 10, 13-14 (1st Cir. 2007); William v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000); Arce v. Aramark Corp, 239 F. Supp. 2d 153, 164-65 (D.P.R. 2003); Runyon, 13 F. Supp. 2d at 220.

the practice).  The 1991 amendments to Title VII allow the employer to then assert an affirmative defense, bearing the burdens of production and persuasion, that it would have taken the same action in the absence of the impermissible motivating factor. Id.  This affirmative defense permits the employer to avoid liability for monetary damages and reinstatement, but may still subject the employer to declaratory and injunctive relief, as well as attorneys' fees, if the employee succeeds in showing that sex discrimination was a motive for its action. Id.

    The question that remains is what qualifies as direct evidence of sex discrimination.  While the answer is not completely settled, "it suffices to say that evidence is 'direct' . . . when it consists of statements by a decisionmaker that directly reflect the alleged animus and *bear squarely on the contested employment decision*." Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60-61 (1st Cir. 2000)(citations omitted) (emphasis added); see also Serrano-Mojica v. El Conquistador Resort and Golden Door Spa, No. 08-1797, 2010 WL 1992575 at *10 (D.P.R. 2010) (describing direct evidence in the context of age discrimination).  It is settled law in this circuit that "inherently ambiguous statements do not qualify as direct evidence." Weston-Smith, 282 F.3d at 65.  Finally, stray workplace remarks are normally insufficient, standing alone, to be probative of discriminatory animus.  The probative value of stray remarks is circumscribed, for example, if they are not related or lack a temporal proximity to the employment decision, or if they are not made by relevant decisionmakers. See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (citation omitted). See, e.g., McMillan v. Massachusetts Soc'y for Prev. of Cruelty to Animals, 140 F.3d 288, 300 (1st Cir. 1998) (sexist workplace remarks remote in time from incident and bearing no direct relationship to employment decision held not probative).

    Title VII plaintiffs, such as Leon here, may also proceed with
circumstantial evidence under the McDonnell Douglas burden-shifting scheme,
by first establishing a prima facie case of gender discrimination. Lockridge,
597 F.3d at 470 (citing Kosereis v. Rhode Island, 331 F.3d 207, 212 (1st Cir.
2003)).  A prima facie case is established by showing that the employee: (1)
is a member of the protected class; (2) suffered an adverse employment action
(3) is qualified for the employment held; and (4) his position remained open
or was filled by a person whose qualifications were similar to his. See
Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 13-14 (1st Cir. 2007)
(citations omitted).  After the plaintiff establishes a prima facie case, the
burden of production (but not of persuasion) shifts to the employer, who must
articulate a legitimate, non-discriminatory reason for the adverse employment
action. Lockridge, 597 F.3d at 470.  If the employer does so, the burden
shifts back to the plaintiff, who must then show, by a preponderance of the
evidence, that the employer's articulated reason for the adverse employment
action is pretextual and that the true reason is discriminatory. Id.  The
pretext inquiry for purposes of summary judgment here reduces to whether
Plaintiff has identified evidence that would enable a reasonable jury to find
that BPPR's proffered reason is pretextual and that he was in fact terminated
because of his gender. See id.; see also Garcia v. Bristol-Myers Squibb Co.,
535 F.3d 23, 31 (1st Cir. 2008) (stated differently: "whether or not the
plaintiff has adduced minimally sufficient evidence to permit a reasonable
factfinder to conclude that [he] was fired because of [his] gender.")


                    **(a) Direct Evidence Analysis**


    Plaintiff attempts to proffer direct evidence of gender discrimination
by showing disparate treatment in the training he was given and in the

disciplinary measures he was subjected to.  Plaintiff submits that Ferrer provided counseling and other job training to other female workers but not Plaintiff, despite his repeated requests to receive the same training.  While he was disciplined, and ultimately terminated for his low productivity alleged to result from his lack of training, another similarly situated female co-worker, Arroyo, received direct counseling and training to improve her low productivity.  Plaintiff also aims to show direct evidence in the form of remarks reflecting discriminatory animus, in particular Ferrer's "lower head" comments.

    The Court holds that Plaintiff fails to establish direct evidence of sex discrimination under the case law elaborated above.  Under the prevailing view of what constitutes direct evidence of sex discrimination, Plaintiff cannot point to any statement by a decisionmaker that reflects discriminatory animus *and bears squarely upon the employment actions at issue*, be they his termination or his inadequate training.  Nowhere does Plaintiff show the Court that Ferrer or any other supervisory employee or even co-worker made any remark even remotely linked to the challenged employment decisions.  Had Plaintiff averred that Ferrer said "I don't train males" or "I'm getting rid of you because I can't stand men" or anything faintly resembling such language, then he would have stood a chance of meeting his burden of setting forth BPPR's consideration of an impermissible motive in subjecting Plaintiff to an adverse employment action.  The burdens of production and persuasion would then shift to BPPR to prove that it would have acted the same way had it not considered his male gender.

    Plaintiff, however, has only armed himself with a generalized "stray remark" - the "lower head" comments - which lacks probative value because, while sexually charged, it is not remotely related to his inadequate training or termination.  Moreover, the remark's probative value is severely curtailed

by its context, as Plaintiff only alleges to have heard Ferrer say it about three times in two years, and directed not at Plaintiff but at a fellow female employee, at her desk located across the hallway from Plaintiff's desk, in reference to a newspaper article concerning domestic violence. While Plaintiff may have felt offended, he did not mention the incident to other employees or report the comment to the Human Resources Department. Finally, without needing to delve into lurid detail, the Court finds that the comment is ambiguous, reflecting one woman's adverse reaction to sociological problem, and not a clearly targeted invective reflecting a sexist ideology or a pattern of anti-male-gender thought.

Plaintiff muddies the waters by burying his direct evidence arguments in a McDonnell Douglas pretext inquiry involving circumstantial evidence of disparate treatment. Circumstantial evidence of disparate treatment is insufficient as a matter of law to qualify as direct evidence entitling Plaintiff to the mixed-motives analysis. Moreover, as will be discussed later in this Opinion, it is also insufficient as a matter of fact, deriving no support from the factual record. Plaintiff sums up his direct evidence analysis by submitting "that Aida Ferrer's involvement in the decision-making process, her sexual derogatory comments against males . . . and her disparate treatment against him as compared to the other female Service Representatives" sufficiently set forth direct evidence of sex discrimination to put this matter to a jury at trial. (See Docket No. 35 at 12.)  Plaintiff is mistaken. Claims of disparate treatment are by their very nature claims supported by circumstantial evidence because they require the drawing of an inference of intent from circumstances showing differential treatment of similarly situated persons. See, e.g., Garcia, 535 F.2d at 31 (analyzing disparate treatment claims under the McDonnell Douglas pretext inquiry); Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) ("[I]n disparate

treatment cases, comparative evidence is to be treated as part of the pretext analysis. . . .").

Claims supported by direct evidence and triggering a mixed-motives analytical framework are simply not driven by a determination of pretext. In this case, the burden is initially on Plaintiff to come forth with direct (and highly probative) evidence that Ferrer considered his male gender in refusing to train him and in terminating him. Assuming Plaintiff can surpass this initial burden, which the Court finds impossible based on the facts, then the burden would shift to BPPR to both produce evidence and persuade the Court that it would have refused to train Plaintiff or would have terminated him for his poor performance anyway, even if Ferrer had not considered his male gender. At neither of these two analytical stages, does pretext play a dispositive role.

Having found Plaintiff's direct evidence arguments insufficient to sustain his Title VII sex discrimination claim, the Court now addresses circumstantial evidence under the <u>McDonnell Douglas</u> burden-shifting scheme.

### (b) Circumstantial Evidence Analysis

As a preliminary matter, the Court notes that male plaintiffs in Title VII sex discrimination cases satisfy the first prong of <u>McDonnell Douglas</u> because they fall within a protected class "in the sense that every person is in a class protected against gender discrimination." <u>Williams v. Raytheon Co.</u>, 220 F.3d 16, 19 (1st Cir. 2000). While the First Circuit has not addressed the "background circumstances" requirement, <u>see</u> *supra* note 3, the Court gleans from the appellate court's language that a heightened burden should not be substituted for the first prong of <u>McDonnell Douglas</u>.

As the burden for establishing a prima facie case is not onerous, <u>see</u>

<u>Kosereis</u>, 331 F.3d at 213, the Court assumes that Plaintiff has pled sufficient facts proving that (1) he was a member of the protected class (a male); (2) BPPR took an adverse employment action against him by terminating his employment; (3) he was qualified for the position he held as a Credit Card Customer Service Representative; and (4) his position was filled by another similarly qualified representative.  While the Court may be tempted to take issue with the third prong, since the proffered reason for his termination was his poor performance and qualifications for his job position, this analysis is better left for the pretext inquiry so as to reach the merits of the discrimination claims *vel non* and likewise afford Plaintiff the benefit of the burden-shifting scheme.

BPPR clearly established a legitimate, non-discriminatory reason for its termination, his poor performance and compliance with the BPPR's job requirements for his position in the Fraud Department.  BPPR cites his numerous absences (e.g. 10 days within the first six months of his employment), and more importantly, his numerous warnings and evaluations complaining of his failure to comply with the department's productivity levels.  While Plaintiff takes issue with the evaluations of his productivity level, alleging that they are discriminatory and inaccurate, this goes to whether BPPR's stated nondiscriminatory reasons are pretextual.  Thus, as is the case for most Title VII labor law suits, Plaintiff's claims hinge on the pretext inquiry and whether he has adduced minimally sufficient evidence calling into question BPPR's proffered reasons as pretextual in order to disguise what is truly discriminatory conduct.

The Court holds that Plaintiff fails to establish any pretext of any kind.  Plaintiff's arguments essentially focus on undermining Ferrer's own employment record and attacking her supervision and training as gender-biased, displaying a preference for Plaintiff's female co-employees and

animus toward Plaintiff as a male.  This contention, though, is not supported
by the factual record.  Plaintiff only cites to one incident of disparate
treatment vis-a-vis one co-employee, Arroyo, who received specific counseling
from Ferrer on how to improve her productivity, as evidence of pretext.  The
facts show, however, that Arroyo was not a similarly situated employee, as
her routine duties were different and simpler than Plaintiff's.  Arroyo
worked as a clerk, only occasionally lending a hand in case monitoring on an
as-needed, emergency basis.  While Plaintiff is correct that pretext can be
shown by "producing evidence that plaintiff was treated differently from
similarly situated employees[,]" to successfully allege disparate treatment,
Leon would need to show that Arroyo was similarly situated to him "in all
relevant respects." Garcia v. Bristol-Meyers Squibb Co., 535 F.3d 23, 31 (1st
Cir. 2008); see also Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st
Cir. 1999) (comparison cases "must closely resemble one another in respect to
relevant facts and circumstances.").  Plaintiff cannot hope to do so.
Plaintiff's job functions as a Credit Card Customer Service Representative,
while overlapping to a certain degree, were greater and more demanding than
Arroyo's, which were more akin to a clerk's.  It would not be unreasonable
for Ferrer to expect greater productivity levels from Plaintiff since his job
functions meant that delays in productivity entailed significant monetary
losses and fines, as well as negative client relations.  The different
demands placed on Plaintiff and Arroyo make her allegedly superior treatment
by Ferrer an unworthy comparison.

The facts also show that Arroyo did not receive the formal training in
credit card regulation that Plaintiff complained of being denied.  Arroyo was
only "counseled," not formally trained, by Ferrer on how to improve her
productivity.  Those female employees who were so trained, took the training
before they started working at BPPR with third-party credit card companies.

Plaintiff even admitted that he was unaware if those third-party companies would have offered him any training while he was employed at BPPR had he requested it directly from them.  The facts are simply unknown as to whom specifically BPPR invited to attend trainings and on what grounds, if any, the attendees were selected to participate.  Based on this record, the Court cannot find any gender-based discriminatory animus toward Plaintiff's training.

As for the claim that Plaintiff was not counseled in the same way as Arroyo, the facts tend to show that Plaintiff did indeed receive one-on-one counseling by Ferrer in relation to his performance evaluations and written warnings.  Ferrer advised Plaintiff of the areas that he needed to improve with regard to his performance and answered any questions he may have had. While Ferrer may not have assisted Plaintiff to the same degree as she did Arroyo in helping him understand *how* not just *what* he needed to improve, this conduct may be motivated by a plethora of non-discriminatory reasons. Ferrer's investment in Arroyo's professional well-being could have merely been a product of a close friendship, for example.  The speculation that Ferrer gave her an upper hand because she is biased against males, combined with stray sexist remarks, is clearly insufficient to call into question BPPR's proffered reasons for terminating Plaintiff as pretextual.  This is especially so when the record shows that Ferrer had a reputation for being a strict supervisor with all of her subordinate employees, including Arroyo, regardless of gender.  Finally, it is worth noting that informal counseling and formal training are employment actions of a categorically different nature, the latter of which is typically the more cognizable Title VII claim. Training reflects a more official employment decision, incurring budgetary costs on the employer's behalf, that employees are entitled to benefit from without regard to sex.

Plaintiff's own witness testimony tends to show that Ferrer treated employees neutrally.  Plaintiff's last-ditch attempt to impugn Ferrer's conduct as discriminatory is his allegation that Ferrer did not properly prepare the productivity reports due to errors in statistics and data, for which she was admonished by her own supervisor, Daysi Ortiz, and for which she allegedly circulated an email admitting calculation errors.  Assuming that errors were made in the calculation of the productivity reports, this alone cannot change the outcome of this case.  Such errors would have affected all of the employee's reports equally and Plaintiff makes no such allegation that his productivity levels were manipulated in any way for sexist reasons.  Moreover, the facts are uncontested that Plaintiff realized that he himself had incorrectly tracked his productivity when he discussed his second evaluation with Ferrer, but that at no point did he request to revise his productivity level.  This undermines any importance Plaintiff now attempts to attach to the accurateness of the productivity reports as a reflection of his supervisor's discriminatory animus against men.

As the factual record shows, at most, Ferrer's conduct is more appropriately characterized as strict.  Ferrer was strict with expecting that her employees, whether male or female, comply with the requirements of their position, including the absence policy and the 100% productivity requirement.  As Plaintiff fails to adduce minimally sufficient circumstantial evidence of sex discrimination, particularly concerning his claim of gender-based disparate treatment, the buck must stop here.  Plaintiff's Title VII sex discrimination claim must be dismissed with prejudice.

## B. Title VII Retaliation Claim

The Court can briefly dismiss Plaintiff's attempt to carve out a retaliation claim under Title VII, for reasons similar to those discussed

above with respect to his sex discrimination claims.  Title VII specifically

states that it shall be unlawful for:

> an employer to discriminate against any of his employees . . . because
> he has opposed any practice made an unlawful practice by this
> subchapter, or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation, proceeding, or hearing
> under this subchapter.

42 U.S.C. § 2000e-3(a).  In order to make out a prima facie case of

retaliation, the plaintiff has to prove that (1) he engaged in statutorily

protected activity; (2) he suffered a materially adverse employment action;

and (3) the protected activity and the adverse employment action were

causally connected. Lockdrige, 597 F.3d at 472 (citing Marrero v. Goya of

P.R., Inc., 304 F.3d 7, 22 (1st Cir. 2002).  An employee has engaged in

protected activity if she has either (1) opposed any practice made an

unlawful employment practice by Title VII, or (2) made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or

hearing under Title VII. Fantini v. Salem State College, 557 F.3d 22, 32 (1st

Cir. 2009).

Since here Plaintiff does not and cannot claim that he was retaliated

against for making a charge or for participating in any investigation or

proceeding, he must therefore proceed under the first prong.  To establish

that he has opposed unlawful sex discrimination, Plaintiff need not prove

that the conditions against which he protested actually amounted to a Title

VII violation, but he must demonstrate that he had a good faith, reasonable

belief that the underlying challenged actions of the employer violated the

law. See id. (citing Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 134

(2nd Cir. 1999).

Plaintiff's prima facie case of retaliation fails because he cannot

reasonably say that he has opposed sex discrimination and that he was

retaliated against for such opposition. See Fantini, 557 F.3d at 32 ("The

term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination.") (internal quotation marks and citation omitted).  Plaintiff argues that he has "engaged in protected conduct by requesting repeatedly that he receive certain on-the-job training" that was afforded to his female coworkers, which led to his negative performance evaluations, which in turn is causally connected to his termination. (See Docket No. 35 at 17.)  Plaintiff makes no effort, however, to explain how requesting training equals protesting or opposing sex discrimination in the workplace, and far less, how he was retaliated against for requesting this training.  It borders on the absurd to find a causal connection between an employee seeking training to better his productivity and his termination by his employer who would benefit from his training. Plaintiff's argument simply makes no sense.

       If Plaintiff had presented the more sensible argument that he protested and opposed Ferrer's preferential treatment of women in counseling and training, he may have surpassed his initial burden of establishing a prima facie case of retaliation.  However, the facts show that Plaintiff did not even complain to her supervisor, other managers, or human resources, about any alleged discriminatory practice.  It appears from the record that Plaintiff simply did not oppose any allegedly unlawful employment practice of BPPR's.  Consequently, Plaintiff could not have had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Fantini, 557 F.3d at 32 (internal quotation marks and citation omitted).  Therefore, Plaintiff's Title VII retaliation claim must also be dismissed with prejudice.


       **C. COBRA Claim**

COBRA entitles terminated employees who lose coverage under an employer-sponsored group health plan to elect a continuation of the same coverage within a certain election period.  29 U.S.C. §§ 1161, 1163.  An employer must notify the health plan administrator of a qualified beneficiary's termination within thirty (30) days of the termination date. 29 U.S.C. § 1166(a)(2).  Within fourteen (14) days of receiving notice, the plan administrator is required to notify the terminated employee of his or her right to a continuation of coverage.  29 U.S.C. § 1166(c).  If an employer is also a plan administrator, then regulations promulgated pursuant to COBRA charge the employer with the provision of notice to the terminated employee.  29 C.F.R. §2590.606-4(b)(2).

COBRA is silent on the sufficiency of notice but the First Circuit takes the position that "a good faith attempt to comply with a reasonable interpretation of the statute is sufficient." Torres-Negron v. Merck & Company Inc., 488 F.3d 44, 46 (1st Cir. 2007) (citing Smith v. Rogers Galvanizing Co., 128 F.3d 1380, 1383-84 (10th Cir. 1997); see also Degruise v. Spring Corp., 279 F.3d 333, 336 (5th Cir. 2002) ("Employers are required to operate in good faith compliance with a reasonable interpretation of what adequate notice entails."); Branch v. G. Bernd Co., 764 F. Supp. 1527, 1534 n. 11 (M.D. Ga. 1991) ("Courts have generally validated methods of notice which are calculated to reach the beneficiary.").  This Court deems employers to be in compliance with section 1166(a) when they provide COBRA notification by first class mail to an employee's last-known address. Torres-Negron v. Ramallo Bros. Printing, Inc., 203 F. Supp. 2d 120, 124-25 (D.P.R. 2002).

There is no genuine issue of material fact here as to the steps that BPPR took to notify Plaintiff of his rights to continued health care coverage under COBRA.  Under the legal authority outlined above, the Court finds that BPPR satisfied its obligation under COBRA by first sending notification to

Plaintiff's last known address of record, then to Plaintiff's new address, and finally, to Plaintiff's counsel.  These steps constitute a good faith effort to issue notice reasonably calculated to reach Plaintiff. Accordingly, Plaintiff's COBRA claim is also dismissed with prejudice.

### D. Puerto Rico Law Claims

The Court should decline to exercise supplemental jurisdiction over state law claims when all federal claims are dismissed. <u>See</u> <u>Camelio v. American Federation</u>, 137 F.3d 666, 672 (1st Cir. 1998) ("The balance of factors ordinarily weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation.")  Since all of Plaintiff' federal claims are dismissed upon granting Defendant's motion for summary judgment, the Court will not exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, which are dismissed without prejudice.

### IV. Conclusion

Viewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences therefrom in his favor, the Court finds no genuine issue of material fact surrounding any and all of Plaintiff's Title VII or COBRA claims against BPPR.  Therefore, Defendant's motion for summary judgment (Docket No. 13) is **GRANTED.**  Accordingly, Plaintiff's Title VII sex discrimination and retaliation claims, as well as his COBRA claim, are hereby **DISMISSED WITH PREJUDICE.**  Plaintiff's claims under Puerto Rico Law 115, Law

100, Law 80, Law 69, and the Puerto Rico Constitution are hereby **DISMISSED**

**WITHOUT PREJUDICE.**


      **IT IS SO ORDERED.**

      In San Juan, Puerto Rico, September 13, 2010


                                      <u>S/ JUAN M. PÉREZ-GIMÉNEZ</u>
                                        JUAN M. PÉREZ-GIMÉNEZ
                                        UNITED STATES DISTRICT JUDGE